THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR24-066-JLR |
| Plaintiff, | ) | |
| v. | ) | KENAN BROWN'S SENTENCING MEMORANDUM |
| KENAN D. BROWN, | ) | |
| Defendant. | ) | |

## I. INTRODUCTION

"America is the land of second chances and when the gates of the prison open, the path ahead [*should*] lead to a better life.[1]" Incarceration alone does little to prepare individuals for the complex realities of life after prison. Because without access to stable housing, employment opportunities, mental health support, and other essential resources, even the most determined individuals will face substantial barriers to successful reintegration into society.

As determined as Mr. Brown was to turn his life around after his recent periods of incarceration, the cards always fell against him. He was not provided with adequate resources or opportunities to make a successful, or sustainable, emergence back into society. Instead of being placed in a halfway house, he was left homeless; and instead

---

[1] The Department of Justice displays this quote from President George W. Bush's 2004 State of the Union Address in which he also said, "we know from long experience that if [released persons] can't find work, or home, or help, they are much more likely to commit more crimes and return to prison." https://www.justice.gov/archive/fbci/progmenu_reentry.html.

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

of being supported, he was forced to focus on his survival. Once in survival mode, he fell back into addiction, which further destabilized him, leading to another series of bad decisions.

With this sentencing, the Court has the power to hold Mr. Brown accountable for the charged conduct, but also to set him up to have a life outside of prison walls. Community-based supervision and conditions that emphasize support and structure will not only ensure justice and Mr. Brown's success, they will also increase the likelihood of long-term public safety.

## II.    MR. BROWN'S PERSONAL HISTORY

Mr. Brown was born into a broken home with parents who were too preoccupied to raise him. One was consumed by the streets, struggling with a drug addiction, while the other was swallowed into the criminal justice system for committing crimes. This left Mr. Brown in the care of his grandparents from infancy until 10 years old.

At the age of 10, the desire to have his mother in his life led Mr. Brown to "bounce around" to different homes in an effort to find his mother. PSR ¶ 68. By 14, he was finally living with his mother, but with that came exposure to her severe addiction and the physical abuse she suffered at the hands of her then-boyfriend. *Id*. Unfortunately, by age 15, Mr. Brown was left to fend for himself when his grandparents moved out of Washington state. *Id*. From there, violence, drugs, and jail would shape the rest of Mr. Brown's "childhood."

### A.    Timeline since Mr. Brown's 2016 sentencing

On September 16, 2016, Mr. Brown was sentenced by this Court to 48 months of imprisonment. Following sentencing, he was placed in a USP and remained there

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 2

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

despite becoming eligible for a medium security facility. Mr. Brown described the environment as frightening and violent.[2] *See* Ex. 1 (Kenan Brown's letter) at 1.

After serving his sentence, Mr. Brown planned on being released to Texas where he had family and resources. Initially sent to a Texas halfway house, he was soon returned to Washington after it was discovered he was under DOC supervision there. PSR ¶ 73. By this time, he had completed prerelease, making him ineligible for BOP halfway house placement, resulting in unstable housing.

Mr. Brown began his first term of supervised release on December 9, 2019. Throughout this time, he struggled with substance abuse, submitting several positive drug tests and missing UAs, resulting in violations that were brought before the Court. Dkt. 41.

On March 12, 2020, Mr. Brown made his initial appearance for the violations, admitted to them, and was released on an appearance bond. *Id*. However, he remained in state custody until April 10, 2020, for unrelated DOC violations.

After further violations, Mr. Brown was arrested and detained on May 11, 2020. Dkt. 51. This Court revoked Mr. Brown's supervision on May 26, 2020, and imposed a time-served sentence with an RRC placement so that he could receive in-patient treatment. Dkt. 55.

Mr. Brown's RRC stay was brief, and he quickly entered treatment at Pioneer Center North (PCN). He reports successfully completing the program despite conflicts with another resident.

---

[2] "United States Penitentiaries are the most volatile of all federal prisons…. The daily environment is filled with high levels of violence, manipulation, extortion, and altercations… Volatility is constant in a USP." *Federal Prison Security Levels*, Federal Prison Time, https://www.federalprisontime.com/federal-prison-security-levels.

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 3

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Post-treatment, Mr. Brown faced housing instability, again. Living in this vulnerable state led to an increase in stress, drug use, loss of his property, missed UAs, and loss of contact with his supervision officers.

Eventually, Mr. Brown was arrested in late November for Fourth Degree Assault and Obstructing a Police Officer. Dkt. 62. He remained in state custody until he was transferred to federal custody on December 24, 2020. *Id*.

At his disposition hearing on January 12, 2021, Mr. Brown requested a time-served sentence with RRC placement. The Government and Probation asked for 14 months of custody with no supervision to follow. The Court imposed 12 months with no supervision to follow. Dkt. 71.

**B.     Following his release in 2022, Mr. Brown was the victim of an unprovoked and violent attack.**

After his release from prison, Mr. Brown found himself unhoused and vulnerable, yet again. Struggling to find long-term living arrangements, he resorted to sleeping in a public park. One night, as he slept on an uncomfortable bench, Mr. Brown awoke to a group of teens throwing barbeque sauce on him. PSR ¶ 76. From this, a fight ensued—Mr. Brown against a pack of random and aggressive teenagers.

Unfortunately, the fight would escalate drastically when one teen pulled out a machete. As the teen was about to strike him, Mr. Brown raised his arm in an attempt to protect his face and neck. The teen brought the blade down powerfully and aggressively. The skin of Mr. Brown's left wrist was sliced completely open, leaving him with a deep wound, physically and mentally.

Unable to ignore the severity of his injury, Mr. Brown attempted to seek medical care. However, the hospital merely wrapped up his arm and gave him a prescription for pain medication that he had no resources to fill. *Id*.

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

With nowhere else to go, Mr. Brown went back to the place of attack, the only place he knew he could sleep for the night. Eventually the adrenaline and paranoia that was keeping him awake and alert dissipated, and the exhaustion from the night's events, along with the extreme pain he was feeling from his inadequately treated injury, caused him to pass out.

Thankfully, noticing his condition, a good Samaritan helped him get to his mother's home. However, this would be another temporary solution to a now infinitely deeper issue. To date, he continues to suffer severe pain from damage to the ligaments in his wrists from the assault. PSR ¶¶ 83–84.

### C. What Mr. Brown has to look forward to after incarceration

"[Kenan is] not the person he portrays when he's on drugs homeless in the streets." Ex. 2 (Shelly Schambeau's letter). It is painfully evident that not having access to stable housing, mental health services, and substance abuse treatment is the core of Mr. Brown's inability to lead a stable life. Access to these resources upon his release will be critical to Mr. Brown's success. Another critical component for success is Mr. Brown's support system. Fortunately, he has family who see his "willingness to do his best to change," and who want to see him succeed on the outside. Ex. 3 (Kevon Brown's letter).

Mr. Brown has reconnected with his eldest son Kevon, and it was decided that the best place for him post-release will be Minnesota:

> I ask if given the chance to move Kenan Brown to Minnesota with me, his eldest son away from all the problems and excuses, for that fresh start and chance to be a better person and make good decisions for his family so we can all grow together instead of being apart like we have been.

Ex. 3.

Relocating to Minnesota will provide Mr. Brown with critical housing stability and, equally important, the opportunity to be present and engaged as both a father and

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

soon-to-be grandfather. His two oldest sons are expecting children soon, and this news has been deeply humbling for Mr. Brown. While it brings him great joy, it also has instilled in him a renewed sense of responsibility. He is motivated to make lasting changes in his life because he recognizes that he still has "stories, skills and positive things" that he has to share with his sons as they begin their own journeys into parenthood. Ex. 3.

### III.     SENTENCE RECOMMENDATION

A sentence must be "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the objectives of sentencing—retribution, deterrence, incapacitation, and rehabilitation." *United States v. Tapia*, 564 U.S. 319, 325 (2011) (summarizing 18 U.S.C. § 3553(a)(2)). Sentencing courts "should consider the specified rationales of punishment *except* for rehabilitation, which it should acknowledge as unsuitable justification for a prison term." *Id*. at 327. A 48-month sentence is sufficient to achieve the objectives of sentencing without creating unwarranted sentence disparities.

####     A.     A 48-month sentence is sufficient in Mr. Brown's case.

Mr. Brown accepts full responsibility for his actions and offers no excuse for the conduct that brings him before this Court. However, in assessing the nature and circumstances of the offense, it is essential also to consider Mr. Brown's history and personal characteristics. 18 U.S.C. § 3553(a). While the seriousness of the offense is not minimized, the context in which it occurred, and the untreated mental health issues Mr. Brown faced, provide important mitigating considerations.

Mr. Brown experienced significant paranoia and anxiety following the violent attack in 2022. This was compounded by longstanding symptoms of post-traumatic stress disorder (PTSD) rooted in a deeply unstable and traumatic childhood. At the time

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

of the offense, he was living in a heightened state of hypervigilance.[3] In this distressed psychological state, he came to believe that carrying a firearm was the only way he could protect himself and survive while still being unhoused.

Despite this, Mr. Brown now recognizes that this perceived sense of safety was illusory, a false sense of security born of fear rather than reason. He understands that true safety will not come from carrying a weapon, but from rebuilding his life with stability, structure, and support. He is committed to doing just that. He also acknowledges that carrying a firearm will only land him back in this courtroom, or worse.

Mr. Brown's fears and reactions, while not justifying his conduct, underscore the importance of addressing the underlying causes of his behavior. With access to mental health services, secure housing, and stable housing, Mr. Brown will be equipped to break the cycle that has kept him trapped in instability. These resources will not only mitigate the risk of future offense but will also finally provide Mr. Brown the foundation for a life he has long sought but never attained.

**B.    Mr. Brown's rehabilitation will be found in community resources, not incarceration.**

Mr. Brown has spent more of his life in the criminal justice system than out of it. That is not just plain recidivism. It is a tragedy. An unstable home life and an early introduction to the criminal justice system were unfortunate predictors of Mr. Brown's criminal trajectory.[4]

---

[3] PTSD patients are at risk for suffering from retraumatization. Retraumatization occurs when people with PTSD are "exposed to people, places, events, situations or environments that can cause them to re-experience past trauma as if it were fresh or new." The intensity of a retraumatization reaction can cause a person to suffer from "persistent fears or paranoia that lead them to a higher level of hypervigilance." *PTSD Retraumatization*, BrightQuest (Aug. 2025), https://www.brightquest.com/post-traumatic-stress-disorder/retraumatization/.

[4] Research finds that lacking family structure and stability are key predictors of juvenile delinquency. More specifically, and directly applicable to Mr. Brown's case, is the research

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Mr. Brown's untreated substance use disorder is another factor to be considered. Growing up in an environment where he saw drugs heavily abused placed Mr. Brown in a vulnerable position to abuse drugs, too.[5]

When "anxious and stressed," Mr. Brown turns to drugs. PSR ¶ 97. Prison does not have adequate resources to support a substance use disorder as severe as Mr. Brown's. Mr. Brown can only be properly treated in a tailored substance use program. This treatment has been long put off, and any additional time spent incarcerated will only add to the delay of getting Mr. Brown the help he needs to address a root issue attributable to his criminal behavior.

Mr. Brown acknowledges that the criminal justice system often imposes increasingly severe sentences for repeat offenses, a practice grounded in the belief that harsher punishment deters future misconduct. However, empirical research does not support this presumption. In fact, studies indicate that more severe sanctions for repeat offenses may increase, rather than reduce, recidivism.[6] "For example, among individuals whose first felony led to imprisonment, recidivism was lower when, in response to a second felony, they were sentenced to less severe sanctions.... [R]egular

---

that has found that boys from "broken homes" experience a higher prevalence of juvenile delinquency than those from stable homes. L.E. Wells & J.H. Rankin, *Family and Delinquency: A Meta-Analysis of the Impact of Broken Homes*, APA PsycNet (2016), https://psycnet.apa.org/record/1991-27682-001.

[5] Studies have shown that families with substance use disorders reveal patterns that significantly influence child development and the likelihood that a child will struggle with "emotional, behavioral, or substance use problems." Lander, Howsare, & Byrne, *The Impact of Substance Use Disorders on Families and Children: From Theory to Practice*, NIH (2013), https://pmc.ncbi.nlm.nih.gov/articles/PMC3725219/.

[6] Research supports findings that more severe sanctions for those who commit a second crime "appear to be more criminogenic." D.P. Mears & J.C. Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, Journal of Research in Crime and Delinquency, 55(2), 194–241 (2018), https://doi.org/10.1177/0022427817739338).

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

and intensive probation typically were associated with lower rates of recidivism." *Id*. Other research shows that repeat offenders benefit more from drug treatment than do first-time offenders.[7]

### C. Mr. Brown's untreated injuries will substantially impact his prison time.

Since his incarceration in November 2022, Mr. Brown has not been able to receive adequate medical attention for his injuries. Records dating back to May 2023 confirm that Mr. Brown suffered an open fracture and tendon laceration. PSR ¶ 83. Medical records from the University of Washington Medical Center diagnosed Mr. Brown with carpal tunnel syndrome in both wrists, chronic wrist fractures, and a ligament injury to his left wrist. PSR ¶ 84. To date, there has been no significant medical intervention to address these injuries.[8]

Mr. Brown will serve his time with what is now permanent damage to his dominant hand, along with a diagnosis of PTSD, anxiety, and a noted chronic substance use disorder. PSR ¶ 85. Serving time in a prison is already punishment enough. Any additional time will only further delay Mr. Brown from getting the attention he needs for his physical and mental health.

//
//

---

[7] As to drug treatment alternatives, offenders with extensive prior criminal history benefit more from drug treatment than offenders with no prior criminal history (a reduction in incarceration of 15 percentage points compared to 8 percentage points). Missouri Sentencing Advisory Commission, *Drug Treatment Can Reduce Recidivism*, 1 Smart Sentencing 2 (July 2009), http://www.mosac.mo.gov/file.jsp?id=45342.

[8] *See* PSR ¶ 86, which notes that Mr. Brown was only prescribed nerve pain medication for his injuries. *See also* PSR ¶ 87, where it was corroborated that Mr. Brown needs surgery to address his injuries.

DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

## IV.  CONCLUSION

"It's never too late."[9] Given the right resources and support, it's not too late for Mr. Brown to lead a successful and stable life. However, stability and success will not be found in the punitive walls of a prison. Mr. Brown knows how to manage prison. But now he needs tools on how to manage his life—a life where, with the right resources, his medical needs, substance abuse disorder, and mental health struggles can be properly addressed and treated.

This country's prison institution system cannot provide Mr. Brown with those resources. If prison were the answer, this memorandum would not be written, because Mr. Brown would not have found himself back before this Court.

Through this sentencing, the Court has the opportunity to flip this narrative and Mr. Brown's story. His success will only be seen when the gates of the prison open, when he is able to start on the path ahead to a better life.

Mr. Brown requests that this Court make a judicial recommendation for a facility closest to his family in Minnesota, where he plans to live with his son and grandchild after his release.

DATED this 2nd day of September 2025.

Respectfully submitted,

s/ *Adriane Manigo*
s/ *Dennis Carroll*
Attorneys for Kenan D. Brown

---

[9] Quote from Exhibit 2, where Ms. Schambeau expresses that Mr. Brown has proven in the past year that it's never too late to change. She has seen this by him becoming the best parts of himself and the best father he can be, considering his circumstances.
DEFENSE SENTENCING MEMORANDUM
(*U.S. v. Brown*, CR24-066-JLR) - 10

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100